317-069-8 Ryan Dayton, et al, at the home of John Csikszentmihalyi. This is Tom's Pledge from the Downtown Sheriff's Department. At least, no more than a minute. Please support counsel. My name is John Spezia. I'm here on behalf of the Dayton family and Amanda Dayton Nearing. On March 24th, 2017, a McDonough County jury returned general verdicts in favor of the Dayton family and Amanda Dayton Nearing against the McDonough County Sheriff's Office and the McDonough County Sheriff's Department. And Officer Pledge. The jury found that Officer Pledge was guilty of willful and wanton conduct that caused the death of Jill Dayton and the injury to Amanda Dayton Nearing. As the court knows, this case has a little longer history than most. Prior to the March 24th, 2017 verdicts, that history includes findings by two different trial judges that there was sufficient evidence from which the jury could conclude that Officer Pledge's conduct was willful and wanton. The history also includes a finding by the trial judge, here Judge Gambrell. During that March, 2017 trial, it was Judge Gambrell who decided that the evidence admitted at trial was sufficient to support a jury instruction containing no less than eight different factors from which the jury could decide whether Officer Pledge's conduct was willful and wanton. The general verdicts returned by the jury in favor of the plaintiffs result in a presumption that the jury found in favor of the plaintiffs on each or all eight grounds that were contained in the instructions. Notably, this appeal does not contain a claim that there was an evidentiary error at trial. The admissibility of plaintiffs' experts' opinions, that's Dr. Alpert. The admissibility of those opinions is not contested, and they came in largely without any objection. The admissibility of the evidence that was admitted on the speed of the Pledge squad car, once again, came in largely without objection, and it is not an issue in this appeal. Neither is the evidence of breaking, and there was conflicting evidence about breaking. There is no claim that the verdicts here were based on passion or prejudice or that the amount of damages is somehow in error. There is no claim that the defendants here were denied a fair trial. Notwithstanding that history, all of the evidence that was properly admitted and presented to the jury on September 28th of 2017, six months after the verdicts, Judge Gambrell decided himself that the defendants were entitled to prevail, and in the alternative, he granted a new trial. His decision is unsustainable. In the trial judge's seven-page order, he cites six police pursuit cases. He never once mentions this court's decision in what I'll call Pledge 1. Under this court's own precedent, that decision in Pledge 1 was binding both on the trial court on remand and on this court on this appeal. In Pledge 1, this court identified 12 factors. We refer to them as the Pledge Factors. Bearing on whether Pledge's pursuit was willful and wanton, and those factors were all proven at trial. We provided the court with a chart that showed the proofs of each one. You can imagine the whiteboard getting prepared for trial. And we did that. This court said that, quote, based on the evidence presented, we find that the trier of fact is entitled to determine whether Pledge's actions were willful and wanton after considering, and this is key, all of the evidence. The second trial in this case was not about the Pledge Factors alone. We considered the criticism of the defense, or I'm sorry, of the dissent in the Pledge 1 opinion. The dissent believed there was not enough evidence for a reasonable person to conclude that there was willful and wanton conduct, so we presented more evidence, yet more evidence of what Officer Pledge knew, and more importantly, when he knew it. 1,700 feet before the point of impact, there's a Clark gas station on the west side of Route 67. I asked this question of Officer Pledge. Is it your testimony that at or near that Clark station, you looked at your speedometer and you were going 70 to 75 miles an hour? His answer, I think so, yes. What did Pledge know at that time, 1,700 feet before impact? He knew there was a minivan in the left turn lane at the intersection with University Drive. He knew the minivan had its left turn signal on. He made a, quote, fair assumption that that minivan was going to turn left in front of him. And what about the minivan? The video shows and the eyewitness testimony was that minivan was moving, moving through the turn lane, moving through the intersection. What else did Pledge know? He knew that University Drive intersection was dangerous. He'd responded himself to other accidents there, other accidents involving injuries. He knew the SUV was not likely to stop. Some would call that a futile pursuit. He knew that his pursuit was likely to end in a crash. He just thought it was going to be the SUV that was going to be the one who crashed. And instead of slowing down, the evidence at trial established that Officer Pledge increased his speed. At a point 440 to 450 feet before impact, I asked Officer Pledge this question. So at that time, you looked at your speedometer and you reported your speed. True? Answer, true. I asked him, you said on the video, just so we're clear, that you were going 100, right? His answer, right. And you meant 100 miles per hour. His answer, right. All the while, as Officer Pledge increased his speed, the minivan kept moving. How do we know that? Because I asked their expert, Trooper McCammott, this question. Isn't it true, sir, based on your review of the video, the Dayton minivan never stopped? Answer, that's the way it appeared. Pledge increases his speed, the minivan keeps moving, and he never even considered discontinuing the pursuit. Oh, there was ample evidence of a conscious disregard. In fact, I mentioned a conscious disregard to this jury no less than 19 times in my closing argument. We were very focused about what we had to prove here, and the jury fully understood it needed to find a conscious disregard. When Pledge reached the point 250 feet prior to impact, there was a white dividing line for right-turning traffic. He was still going 90 to 100 miles an hour. How do we know that? Eyewitness, Lindsay Klingent. Here's the question. So, can you give us an estimate of how fast the officer was going as he headed into the intersection? Answer. No objection, by the way. Answer. I would guess he continued between 90 and 100 miles an hour. The admissibility of that testimony is not contested here on appeal. Even their own expert, who was called at this trial, could not get Pledge down to 86 miles an hour until he was about 150 feet before the point of impact, halfway down that white dividing line. And he's still going 86 miles an hour, more than double the speed limit. Their expert testified he needed 506 feet to stop, but we know this. He never even braked. Here's the question to, once again, the trooper McCammond. Isn't it true, sir, there was no indication in the video that Officer Pledge applied the brakes? His answer? Correct. No braking. What about an evasive maneuver? None. No skids, either. Ample evidence of a conscious disregard. Abundant evidence. I would say to this court, overwhelming evidence from which a jury could have determined there was a conscious disregard. One more thing. Their own expert said there were five seconds when the Dayton minivan was in full view. Five seconds. That's 750 feet of a line of sight. Not what the trial judge said in his order, this 4,000 feet. And during that period of time, there was one second of a full obstruction of these vehicles. And what did Officer Pledge do? He didn't slow down. He didn't brake. Not according to the evidence. Dr. Alpert's opinions. A criminologist from the University of South Carolina who studied police pursuits for 30 years. He said during the two minutes, and this is important, during the two minutes that Pledge followed the Herrera vehicle, that SUV, before he even turned his emergency lights on, Dr. Alpert said a, quote, well-trained officer thinks through what his or her policy is. In this case, did I have an attack? No. Should I pursue? No. Two times at trial, I asked Officer Pledge, you're not here today to tell us that you had discretion to violate this mandatory policy, are you? And he said, no, I'm not. He didn't have discretion to violate the policy. And he didn't just violate one policy. He violated multiple, multiple provisions in the sheriff's policy. With regard to the pursuit. Dr. Alpert, what's reckless and what's the conscious disregard for safety is that he violated the first part of 3.02 where he engaged in a pursuit that was for an offense not included in the policy. And he goes on. Dr. Alpert says this was a dangerous high speed pursuit and he consciously disregarded the safety of everyone. No one's here contesting the admissibility of that evidence. But it's completely disregarded by the trial judge. And I doubt we're going to hear it from the defendants today either. I'd like to address this. One last thing with Dr. Alpert. Dr. Alpert said it didn't matter whether Pledge slowed down to 86 miles an hour. I asked him the specific question. He said, 86 miles an hour is still way too fast. We don't expect traffic to be going. I agree with Dr. Alpert. This is not close. This is not a close case. I want to briefly touch on the allegedly inconsistent verdicts. Number one, the allegedly inconsistent verdicts have no impact on the wrongful death verdict. None. Not according to the express language of the wrongful death act. Not according to the instruction that was given to the jury. They were specifically told you are not to consider the contributory negligence of Amanda Dayton in connection with the wrongful death verdict. These allegedly inconsistent verdicts have no impact on the breach of duty. They have no impact on the findings of Willful and that Pledge's conduct was willful and wanton, that he was the proximate cause, the damages, no impact at all. If anything, the sole impact of the alleged inconsistent verdicts is on Amanda Dayton's ability to recover her proportionate share of the wrongful death verdict and possibly her own injury claim. Though there really is no dispute that the 12.5% is somehow an error. The verdicts are not inconsistent regardless, and here's why. First, contributory negligence is qualitatively different than negligence in tort. So says the Fourth District Appellate Court in three different decisions, starting with Lowey, Ogg, and ending with Long. There was no disparate finding on Amanda Dayton's disregard for her own safety because there was only one such finding. There was no disparate finding of her responsibility in tort because there was only one such finding. These were different claims. One involved an injury. One involved death. I would submit to the court no different than the facts in the Bosiaco case that's cited with approval by our Supreme Court in Redmond. In Bosiaco, there was a 40% finding of contributory negligence and zero in tort for property damage. An injury claim, a property damage. Here, injury and death. Reasonable hypotheses that support the verdicts. First, the speed of pledge. The sole cause of death. That's what the jury could reasonably have determined. Why? Because the speed caused the complete destruction of the minivan. Not just the minivan. It precisely where Jill Dayton was sitting was completely destroyed by the speed of pledge. And what about the injuries? Spinal cord trauma, fractured and dislocated cervical spine. The jury could have reasonably decided it was pledge and his speed that caused those injuries that resulted in the death of Jill Dayton. Then we had the defendants bringing out testimony about there was a two-year delay between when Amanda Dayton sought psychiatric care after the crash. And on cross-examination, they brought out the continuous improvement once she started with psychiatric care. That was their own cross-examination. The jury could have easily factored that in and said she delayed in getting treatment. But you know what? Here's the thing. We don't even get to the inconsistent verdicts. We don't even get to the inconsistent verdicts because that issue has been forfeited. There's been no jury instruction that's been provided to this court or to the trial court that would cure this alleged error of the possibility. That's what they say now. There shouldn't have even been the possibility that the jury make this disparate finding. No such instruction was ever submitted. And this is a classic case of invited error. A party who invited error by not objecting to an answer to a jury question is not entitled to a new trial. Quote, to allow a defendant to object on appeal to the jury's, to the trial court's response to the jury's question that he agreed to at trial would offend all notions of fair play. So what do we have here? Defense counsel says, my preference, that's his words, my preference is that the jury be instructed that they've been told everything. They have all the instructions. In a post-trial hearing, defense counsel says, absolutely, absolutely they agreed with the jury's, with the trial court's instruction that allowed the jury to make findings on both contributory negligence and on the tort claim. So I guess I'll leave it with this. The jury's question is pretty simple. It says, do the percentage amounts on form A and form C need to be equal? I guess I'll leave with this question. If defendant's counsel knew, if he knew that they had to be equal, my question is this, why didn't he just say yes? Thank you. Counsel, you may proceed. May it please the court, counsel? I'm Laura Lee Burkett, and I am here on behalf of the Eppley McDonough County Sheriff's Department and Officer Thomas Pledge. I refer to them together as Officer Pledge. In the opening section of Officer Pledge's argument, he set forth the standard of review and the test that must be applied to a motion for a judgment notwithstanding the verdict. Of course, the standard of review is de novo, and the Supreme Court set forth the test, which is that all evidence, when viewed in a light most favorable to the opponent, so overwhelmingly favors the movement that no contrary verdict based on that evidence could stand. It was the PEDRIC standard by which Judge Gambrell exhaustively analyzed the record in this case. He employed the PEDRIC standard throughout his discussion of the motion for judgment notwithstanding the verdict, and used the manifest weight of the evidence. When he was discussing whether or not a new trial should be awarded, there is no question that Judge Gambrell applied the correct standard. And when the PEDRIC court, in deciding on the correct standard for a judgment NOV, the Supreme Court expressly rejected the test that required a motion for such a judgment be rejected if there was any evidence at all to support the jury verdict. Why? Because the court tells us that literal application of the test prohibits direction of the verdict, even though the evidence relied on for the verdict is so overwhelmingly rebutted that the verdict cannot stand. That's a very important statement by the court in PEDRIC. If the evidence upon which the verdict stands is so overwhelmingly rebutted by the remainder of the evidence, that verdict cannot stand. This case must be affirmed on the question of whether or not Officer Thomas Pledge acted with willful and wanton conduct. Because that's the determinative question in this case. Was there willful and wanton conduct? Did Officer Pledge intend harm? No, there's been no evidence of that. So did he show an utter indifference to the safety of others, or did he act in conscious disregard of that safety? That's the determinative question. In PEDRIC, the Supreme Court examined the testimony of the witnesses. Three testified the lights at a railroad crossing were not flashing. Seven testified that those lights were flashing. This question was determinative of the outcome of the case. In this case, Judge Gambrell examined the testimony of the witnesses. One said Officer Pledge was going 100 miles per hour in the intersection. Three said that he was going about 70 to 73 at the point of impact. That is a question that's determinative of the outcome of this case. In PEDRIC, the Supreme Court examined the other testimony of those three witnesses to see whether there was anything instructive about the probative value of their testimony. The court noted that it looked to see whether those witnesses testified consistent with facts that other witnesses testified to as established. It looked at whether the witness was consistent in what they could see or could not see, or what was blocking their view or was not blocking their view. Now, in this case, they weren't aware of, they also wasn't aware of what kind of, basically it might have been a DUI? Yes. And so one of the factors in the policy was about the seriousness of a felony, right? Yes. And so he wasn't sure about what felony was committed. And it's his testimony about a lot of the speed, right? No. No, Your Honor. There is testimony by him about his speed, of course. But there's also what opposing counsel established was live footage of the events as they actually unfolded, and that's the dash cam video. And when two experts, only one retained, the other was doing his job as a state police officer, used that video. They both were able to come to consistent findings that he was going 70 to 73 miles at the point of impact. He had slowed down. There is no question that he had slowed down while approaching that intersection. Now, clearly... Unfortunately, the Dayton van, he was going 70 to 73 miles per hour. So I am saying that you are not acting with absolute indifference to the safety of others when you slow a vehicle some 30 miles per hour while you're approaching an intersection. And let's also remember that that intersection, there were no pedestrians. There was no cross traffic. There was only one other vehicle going north by the time he got to that intersection, and that was Klingin, who testified that she believed he was going 100 miles an hour, that she saw it in her rearview mirror while she was talking to her boyfriend on the phone and driving north. That's very similar to the analysis or to the kind of facts that the Supreme Court analyzed in Pedrick. And when the Supreme Court did that, it concluded that the testimony of the seven overwhelmingly rebutted the testimony of the three witnesses. In this case, Judge Gambrill did the same thing and concluded that the testimony of the retained expert and of McCormick, who was a state police officer merely fulfilling his duties, was not connected to Thomas Pledge. They both applied the same sort of test, mathematical, to the video and concluded, arrived at the same conclusions that he was going 70 to 73 miles an hour at the point of impact. He had to have slowed his vehicle. He had to have braked. Well, the Clark station was 1,700 feet out, and by the time he got to the turning lane where you can turn off, it was about 70 miles an hour. It was about 75 feet, 85 feet to impact. So, he braked. There was an eyewitness, if I'm remembering very correctly, that indicated that, and the eyewitness is what was on the side thing that observed the whole thing, didn't see any brake lights go on. Isn't that right? She did not. This is the person who was driving north. I am assuming she was watching the direction of her car when she was driving it north at least part of the time. She only saw Thomas Pledge in her rearview mirror. That's it. Now, her testimony was that she never observed the officer brake at all during this whole. This is true. She did not see his brake lights come on. That was based on her testimony that she did not see the brake lights come on. That was her testimony. Yes, it was 1130 at night. She would have seen the brake lights if she had been looking at the moment that he applied the brakes. But her testimony, she observed the whole thing, isn't that right? That is her testimony, yes. Watch the whole accident play out. And her testimony was that she was driving north. And unless she was completely disregarding her duty to watch where she was going, and this is a woman who was also talking on the phone to her boyfriend at the same time. So, Judge Gambrell looked at her testimony and then took the testimony of the two experts that is based on the actual footage of the events as they unfolded that night. This isn't something that was recreated. This isn't a video that Thomas Pledge's expert came up with. This is the dash cam video. And did the police officer, the state police officer, testify that there were no brake lights apparent in the video? He did. The dash cam is in front. It is facing forward. Brake lights are in the rear. So he did not testify that he did not brake. It is an absolute impossibility to slow a car from 100 and end up at 70 without having braked. There is no, you had to have slowed the car. Thomas Pledge slowed the car. There were no skid marks. There were no skid marks. That's true. So, to understand you, where we're dwelling on this, is the slowing of the speed would negate a conscious disregard. Is that what your whole point is? Yes, that was, I'm actually talking more about it because of the questions. But yes, that is the point. How do you act with an absolute, complete disregard and utter indifference to anybody's safety when you are also slowing your vehicle? Those two things do not work together at all. But it wasn't just those two things. Judge Gambrell also viewed the video, and when he reviewed the video, what he saw was that Officer Pledge had his lights and sirens activated the entire chase and were continued to be activated at the intersection. Now, the reason I'm asking the question is because this is a judgment that takes away the verdict from the jury. It does. Okay. And so you have the evidence from the defendant's standpoint, the expert testimony, but then you have the eyewitness testimony. And so then, normally when you ask for a jury trial and it's a jury question, and there are these competing evidence. And I ask you to look at what the PEDRAC court did. The PEDRAC court did not just set forth a standard. It actually examined the testimony of the witnesses and took the jury verdict back away from the jury. It overturned the jury verdict, and it did that by examining the witnesses of the testimony and determining that that testimony that said there were no lights was overwhelmingly rebutted by the remaining testimony. And that's what Judge Gambrell found, that Klingen's testimony was overwhelmingly rebutted. So did we review Judge Gambrell's conclusions? No, you reviewed the Stanovo. Right. But I am saying, what I am saying is that the manner in which Judge Gambrell approached this was absolutely consistent with PEDRAC. So he applied the same methodology as in PEDRAC. Yes. Okay. And that this court would then. . . Then your argument is we should apply the same methodology. Yes, absolutely. Yes. Counsel has two minutes. But then the question is, if you're applying that methodology, it's a question of if it was misapplied or not by the trial judge. That would be your question, yes. Judge Gambrell, both PEDRAC and your trial and the generality, how does that work? Well, obviously, one of those were presented to him in the alternative, which is completely permissible. Did PEDRAC impose? He did. He found that the evidence that was to support the verdict was overwhelmingly rebutted by the remaining evidence, and so he granted the motion JNOV. But because Thomas Pledge had also requested a new trial in the alternative, Judge Gambrell then examined the manifest weight of the evidence and determined that it did not, that it supported a conclusion that was contrary. My question is. . . Mm-hmm. . Well, it's our position that if this Court agrees that or performs the same kind of analysis in faithful adherence to PEDRAC, it will determine that the JNOV was properly granted and that will end the matter. . This is a test. . . . . . . . . . . . Okay, so let's start with this. This court's decision in pledge one addressed an issue that was raised by the defendants in their petition for rehearing. Here's what they say, quote, The defendants demonstrated that deputy Pledge's conduct cannot, as a matter of law, be characterized as willful and wanton. That issue has been decided. It was decided in pledge one. There are twelve factors this court decided that could constitute willful and wanton conduct. The other thing that this court importantly decided, and I believe it is consistent with all of the decisions . . . Were those really factors in that decision? Or were they more a description of what the evidence was with regard to rendering that judgment in that case? I think they're both. But there's no question that this case turns on its own facts. And that's how this court's decision in pledge one is consistent with all the police pursuit cases. This is a uniquely intense focus on the facts of the case. This court happened to identify twelve from which a jury could have found willful and wanton. We proved all of them. As I said before, we proved more. The Peddrick Standard does not allow the defendants here to construe the facts most favorably to them. And that's what they've done. It's very clear that's what they've done. Justice Holdred's question about why are we talking about the trial judge's decision. Exactly. This is Dean Oval Review on the JNOV. Unfortunately, he also granted a new trial. And that's why we have to look at his decision somewhat. Counsel said that Trooper McCammon testified. Is that inconsistent? I don't know that the rulings are inconsistent. I just know they're wrong, both of them. Because there was substantial evidence here to support this verdict. So the question about the point where the vehicle slowed down, where Pledge's vehicle slowed down, I think Justice Litton asked that question. And the court is on to the significance of this, I can see. So first of all, Trooper McCammon never testified anything about brake lights, ever. What he testified is what I read to the court, the question and answer. Is there anything in the video that shows Pledge brake? Answer, no. None. What's the speed limit in that area? Forty. It's 40 miles an hour. But he was familiar with the area. He responded to accidents at that intersection before. But here's the thing. There's an overwhelming focus on Pledge slowing down. And the evidence at trial was that even if you believe that he slowed down and you agree with this approach of three to one, right, there's three witnesses who said he slowed down and there's only one who said he didn't. So we lose. Even if you agree with that, which is not the law. The best they can do is they're experts saying that halfway through that white dividing line, about 160 feet before impact, Pledge has got his speed down to 86 miles per hour. And you know what? That doesn't make him un-reckless. See, Pledge was reckless way back at 440 feet. He was actually reckless at 506 feet and 600 and 700 and 800. Why? Because as he approached that intersection, he was increasing his speed or maintaining it at 100 miles an hour. Two and a half times the limit. 146 feet per second versus 59. And you know what? He couldn't stop. His stopping distance at 86 miles an hour is 500 feet. So even if he started slowing down halfway through that dividing line, 160 feet before the crash, that doesn't make him un-reckless. He consciously disregarded all these facts way back, way before that. We're asking... Thank you. In the event that the court considers this argument about the inconsistent verdicts, we've offered an approach for the court. Our position is they're not inconsistent, but if the court did decide that, there's no claim here that the 12.5 percent wasn't supported by the evidence. And if they have to be the same as the defendant suggests, even if you get to that issue, then apply the 12.5 percent to Amanda's share of the wrongful death verdict, her proportion of the wrongful death verdict. And we'll agree to a remitter if that's the vehicle that the court decides. The last thing I'd say is this. We're asking that this court reverse Judge Gambrell, reverse his decision on the J&OV, reverse his decision on the new trial, reinstate the verdicts, and award the plaintiffs their post-judgment interest. There's no question that the amount of this verdict was certain, which is a requirement for post-judgment interest. And there's also no question that the defendants have had the benefit of that money since the time the judgment was entered on the verdicts. So we've cited a case to the court. I believe the statute is clear that not only is the plaintiff here asking for a reversal of Judge Gambrell, a reinstatement of the verdicts, but also for post-judgment interest. Thank you very much. Well, we'll take this matter under advisement and render a decision.